## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| SCP TUSCALOOSA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 7:17-cv-00228-LSC |
| | ) | |
| UNIVERSITY HOUSE | ) | |
| TUSCALOOSA, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OF OPINION

Before the Court is Defendants University House Tuscaloosa, LLC ("UHT") and Scion Group, LLC's ("Scion") (collectively "Defendants") motion for summary judgment. (Doc. 67.) The motion has been briefed and is ripe for review. For the reasons stated below, Defendants' motion for summary judgment (doc. 67) is due to be GRANTED in PART and DENIED in PART.

### I.    BACKGROUND[1]

---

[1]     The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*,  17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .") (internal quotations omitted). These facts are taken from the parties' "Undisputed Material

This case arises from an agreement between Plaintiff SCP Tuscaloosa, LLC ("SCP") and University House Communities Acquisitions, LLC ("UHC") for the sale of a student housing apartment community known as "South 10" in Tuscaloosa, Alabama. On July 2, 2015, pursuant to a Purchase Sale Agreement (the "PSA"), UHC acquired South 10 from SCP for $56,625,000.00. Approximately two months later, UHC assigned its rights and obligations under the PSA to Defendant UHT.

The PSA provided that "[i]n addition to the Purchase Price [SCP] shall have the right to earn additional compensation" for finding tenants that executed leases for South 10's vacant retail spaces. (*See* Doc. 69-2 at 10.) According to the terms of the PSA, this agreement was to be memorialized in a separate Earn-Out Agreement. SCP and UHT executed the Earn-Out Agreement on October 1, 2015. Under the Earn-Out Agreement, SCP was entitled to receive compensation for any leases executed with retail tenants at the time of closing as well as for any leases with tenants that were signed within eighteen months of the time of closing (the "Earn-Out Period"). SCP could also receive compensation if, within ninety days after the Earn-Out

Facts" sections of the parties' pleadings in support of and opposing summary judgment. While the parties dispute the relevance and materiality of some of the facts contained herein, they agree that they are undisputed, unless otherwise noted. The Court views the facts in the light most favorable to the non-moving party. *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012).

Period expired, UHT entered into a lease with a tenant that SCP had been actively negotiating with during the Earn-Out Period. Specifically, the Earn-Out Agreement stated:

> During the Earn-Out Period, SCP on [UHT's] behalf, shall have the non-exclusive right together with [UHT], its agents and brokers, to market the Vacant Retail Space, and to negotiate and reach preliminary agreement with prospective retail tenants as to the definitive lease terms for new Retail Leases for the Vacant Retail Space . . ., which definitive lease terms must comply [with] the requirements of this Agreement, including, but not limited to, the retail leasing criteria set forth on Exhibit B attached hereto . . . except as approved by [UHT]

(*See* Doc. 69-4 at 3.) It also required UHT to execute all compliant retail space leases: "[UHT] shall be obligated to enter all Vacant Space Leases that shall comply with the provisions of this Agreement, including, but not limited to, the Retail Leasing Criteria." (*See id.*) While the Earn-Out Agreement specified deadlines for certain matters, such as delivery of payment, and stated that "time is of the essence," it did not provide a deadline by which UHT had to execute a complying lease forwarded by SCP.

Any costs of improvement of the retail space, including leasing commissions and locator fees, fell upon SCP up to a certain amount per square-foot. During the Earn-Out Period, SCP incurred approximately $430,000 in improvement costs after it contracted with Genoa Construction to complete build-out work at South 10.

In December 2015, a prospective tenant, BOBA, contacted Joe Strauss ("Strauss"), a real estate agent working on behalf of SCP, and expressed interest in leasing space at South 10. BOBA's representatives, two college students, wanted to use the retail space as a small coffee shop. On April 12, 2016, BOBA executed a letter of intent, which stated that it contained the basic terms and conditions upon which UHT would be willing to enter a formal lease with BOBA. The letter of intent included two contingencies: (1) UHT's approval of BOBA and its guarantor's financial statement; and (2) the mutual execution of a lease document. A few days after the execution of the letter of intent, BOBA sent Strauss its financial statement, which consisted of the students' "parents' partial saving deposits from three major banks in China." (*See* Doc. 70-3 at 4.)

On April 22, 2016, SCP sent UHT an email attaching: (1) a standard form lease modified for the South 10 project; (2) the BOBA letter of intent; and (3) a form lease modified to the BOBA letter of intent. (*See* Doc. 70-4.) Sometime prior to April 27, 2016, Jeff Lohmann, a UHT employee, told SCP's Vice President Charles Welch ("Welch") that Defendant Scion would need to review these documents.[2] In a May 3rd email with Welch, Lohmann stated

---

[2]    The record is unclear as to why, in April 2016, UHT told SCP that Scion's approval was necessary. Although UHT employees knew, as of January 2016, that preparations

that "the lease form you sent is fine." (*See* Doc. 70-6 at 2.) On June 21, 2016, Scion entered into a Property Management Agreement with UHT, with respect to South 10. Among Scion's duties under the Property Management Agreement is to "take . . . actions in the name of and on behalf of [UHT] that are customarily within the scope of property management and leasing services for properties of a similar type, size and quality to the Property . . . ." (*See* Doc. 69-6 at 11.)

After Lohmann's May 3rd email, SCP continued to negotiate the terms of the lease with BOBA. On June 6, 2016, SCP sent a revised lease to BOBA, which BOBA executed by June 10th. On June 13, 2016, Welch forwarded the revised lease to UHT along with a "redline[] against the original form lease." (*See* Doc. 72-1 at 3.) Mitchell Smith ("Smith"), Scion's Chief Operating Officer, contacted Welch on July 15, 2016 and asked that he forward him the BOBA lease so that Scion's counsel could review it. Once it reviewed the BOBA lease, Scion provided SCP with a redlined version of the lease, which included Defendants' revisions and comments, and requested a copy of BOBA's guarantor's financial statements. After some back and forth between Welch and Scion regarding the need to continue to negotiate

---

were underway for Scion to manage UHT, Scion did not have any formal relationship with UHT prior to June 2016. (*See* Doc. 69-5 at 12.)

the terms of the lease, Welch sent Scion's revisions to Strauss and BOBA on August 4, 2016. That same day, Welch provided UHT with U.S. bank statements from BOBA, which indicated that BOBA's owners had around $40,000 in funds within their personal bank accounts.

SCP received the revised executed lease from BOBA on August 26, 2016. Welch then mailed the lease to Scion. The lease arrived at Scion on September 9, 2016, but was not discovered by Scion until September 21st because Welch sent the lease in a non-descript white plan tube and FedEx delivered the lease to Smith's office while he was out of town. Once Scion located the revised lease, it contacted SCP and requested a summary of Tuscaloosa's retail market so that it could show its investors how BOBA's lease terms compared to other retail spaces in Tuscaloosa. On October 6, Scion asked for clearer copies of BOBA's financial statements. On October 13, 2016, one of BOBA's founders emailed Strauss to inform him that it was no longer interested in leasing space at South 10. Later that day, Strauss forwarded the email to Welch stating that "[t]his deal took way too long to get any responses." (*See* Doc. 73-8 at 2.) Welch, however, did not inform Defendants that BOBA had withdrawn its interest in the lease, and Scion eventually executed the BOBA lease on November 4, 2016.

During the time SCP and Scion were negotiating the BOBA lease, another SCP real estate agent, Tracy Gatewood ("Gatewood"), was actively searching for potential retail tenants for South 10. On December 2, 2016, Waitr, an online restaurant delivery service, contacted Gatewood about its interest in a potential lease. Welch sent a Waitr letter of intent to Scion on February 17, 2017. On February 22, 2017, Scion emailed Waitr a reply to the letter of intent, which included a cover letter, signed letter of intent, and signed addendum to the letter of intent. One way in which the addendum differed from the letter of intent was that it stated that a general contractor would "perform all Tenant improvements, under a contract between Tenant and the contractor" (*See* Doc. 74-3 at 7.).

On March 7, 2017, Waitr informed its retail broker that it had decided to move on from South 10 and look elsewhere for retail space. The reason given for Waitr's withdrawal was that "[w]e don't want to have to hire our own contractors etc." (*See* Doc. 74-4 at 3.) However, on March 21, 2017, Waitr sent its retail broker final architectural drawings of the South 10 space, which led Gatewood to believe that negotiations with Waitr were back on track. Moreover, when the Earn-Out Period expired on April 1, 2017, SCP listed Waitr as one of the potential tenants with which it was actively negotiating. But by May 2017 it was apparent to Gatewood and SCP that Waitr would not

be leasing space at South 10. Waitr eventually moved its business to Birmingham, Alabama, and as of January 2019, no retail tenant had leased space at South 10.

## II.   STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact[3] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

---

[3]     A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1049 (11th Cir. 2015).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III.    DISCUSSION

As an initial matter, the Court will address Defendants' request that all of SCP's asserted facts be stricken. Rather than respond to Defendants' statement of undisputed material facts, SCP admitted Defendants' facts and supplemented those facts with its own statement of facts. Moreover, SCP has dispersed various factual assertions throughout its brief opposing summary judgment that are not contained within its supplemental statement of facts. SCP's failure to include these factual assertions within a discrete section of its brief does not comply with the Uniform Initial Order entered in this case. (*See* Doc. 13 at 16–17.) Because SCP has stated that it accepts Defendants' statement of undisputed facts, the Court considers these facts to be true. However, the Court still must view this evidence in the light most favorable to SCP. Regarding the other pertinent portions of the record, the Court has used its discretion in making findings of fact. The Court notes that the factual assertions made by SCP throughout its brief are generally consistent with Defendants' facts.

Turning to the merits of Defendants' summary judgment motion, SCP brings claims for breach of express contract, negligence, unjust enrichment, and fraudulent suppression against Defendant UHT. It brings claims for

breach of implied contract and negligence against Defendant Scion. Defendants have moved for summary judgment on all claims.

## A.    Breach of Express Contract

In order to be successful on its breach of express contract claims, SCP must demonstrate (1) a valid contract binding the parties; (2) its own performance under the contract; (3) UHT's nonperformance under the contract; and (4) resulting damages. *See Barrett v. Radjabi-Mougadem*, 39 So. 3d 95, 98 (Ala. 2009). While UHT concedes that the Earn-Out Agreement constituted a valid contract, it asserts that SCP has failed to show that its actions breached that contract's terms.

### 1.    BOBA Lease

SCP alleges that UHT breached the Earn-Out Agreement by failing to execute the BOBA lease in a timely manner. The Earn-Out Agreement provides that UHT was "obligated to enter all Vacant Space Leases that shall comply with the provisions of this Agreement." (*See* Doc. 69-4 at 3.) Under Alabama law, where, as here, "a contractual obligation to perform exists, and no time is prescribed in the contract for performance, the law requires the obligated party to perform within a 'reasonable time.'" *Grand Harbour Dev., LLC v. Lattof*, 127 So. 3d 1230, 1240 (Ala. Civ. App. 2013) (quoting *Lemon v. Golf Terrace Owners Ass'n*, 611 So. 2d 263, 265 (Ala. 1992)). "[T]he

determination of a 'reasonable time' is a question of fact and 'depends upon the nature of the act to be done and all the circumstances relating to the act.'" *Id.* (quoting *Gray v. Reynolds*, 553 So. 2d 79, 82 (Ala. 1989)).

UHT argues that there can be no dispute that it executed the BOBA lease within a reasonable time. The Court disagrees. As the determination of what constitutes a reasonable time is a question of fact, it is for the trier of fact to decide. Here, the trier of fact could find that the amount of time it took Defendants to execute the BOBA lease was unreasonable. While SCP sent UHT the revised, compliant BOBA lease on June 13, 2016, Scion did not approve the lease until August 9, 2016. This approval only occurred after Scion made several changes to the lease. Moreover, even after Scion received BOBA's assent to its lease modifications on September 21, 2016, it did not immediately execute the BOBA lease. Instead, it asked SCP to provide it with a summary of the Tuscaloosa retail market and clearer copies of the BOBA financial statements. Although Defendants contend that it was reasonable to wait to execute the BOBA lease until they obtained more legible financial statements, Scion eventually executed the lease on November 4, 2016 without having ever received the requested financial statements. This suggests that the lack of a legible financial statement is not what caused the delay in execution. Thus, the trier of fact could find that, due

to the actions of its agent Scion, UHT failed to execute the BOBA lease in a timely manner and that this is what caused BOBA to withdraw from the lease agreement.

Alternatively, UHT argues that SCP acquiesced in any delay in execution of the BOBA lease and thus cannot now claim that this delay breached the terms of the Earn-Out Agreement. An intent to waive a right "may be found where one's course of conduct indicates the same or is inconsistent with any other intention." *See Hughes v. Mitchell Co., Inc.*, 49 So. 3d 192, 202 (Ala. 2010) (quoting *Stewart v. Bradley*, 15 So. 3d 533, 543 (Ala. Civ. App. 2008)). The Court concludes that whether SCP waived its right to timely execution of the BOBA lease is a question of fact.

To support their assertion that SCP acquiesced in the delay in execution, Defendants point out that SCP permitted Scion to review and revise the lease, provided Scion with the requested information about the Tuscaloosa retail market, and agreed to ask BOBA for more legible copies of its guarantors' financial statements. This evidence is insufficient to support a finding that, as a matter of law, SCP agreed to allow the Defendants to take as long as they did to review the BOBA lease. UHT directed SCP to submit the BOBA lease to Scion for review, and Scion was the one who said that the lease would not be executed absent receipt of the Tuscaloosa retail

market information and more legible financial statements. Thus, viewing the evidence in the light most favorable to SCP, it appears that Defendants were the only ones hampering the execution of the BOBA lease.

Moreover, other evidence suggests that SCP did not consent to Defendants' delay and in fact objected to Scion's requests. For example, after Scion sent its proposed revisions to Welch, he replied by asking Scion to minimize any changes to the BOBA lease and noting that BOBA had "been very patiently awaiting a lease signature for over six weeks." (*See* Doc. 72-4 at 4.) Indeed, the emails between Welch and Scion indicate that Welch only agreed to Scion's proposed course of action in an attempt to resolve issues that Scion had with the BOBA lease so the lease could be executed more quickly. Viewing this evidence in the light most favorable to SCP, its conduct did not waive its right to have the BOBA lease executed in a timely manner. Accordingly, UHT's motion for summary judgment on the BOBA-related breach of contract claim is due to be denied.

2.    Waitr Lease

SCP also alleges that UHT breached the Earn-Out Agreement when Scion sent the proposed addendum to the Waitr letter of intent. The Earn-Out Agreement provides that "[d]uring the Earn-Out Period, SCP, on [UHT's] behalf, shall have the non-exclusive right, together with [UHT], its agents and

brokers, to market the Vacant Retail Space, and to negotiate and reach preliminary agreement with prospective retail tenants." (*See* Doc. 69-4 at 3.) It goes on to say that:

> Neither SCP nor [any agent of SCP] shall have any authority to execute any letter of intent on behalf of [UHT], Vacant Space Lease or any other definitive or binding agreement binding [UHT] with respect to the leasing of any Vacant Retail Space, the parties agreeing that only [UHT] or its designated representative will execute all such definitive and binding agreements with respect to the leasing of any Vacant Retail Space, including any Vacant Space Leases, once SCP has negotiated, on behalf of [UHT], the definitive lease terms for any new Vacant Space Lease. [UHT] shall be obligated to enter all Vacant Space Leases that shall comply with the provisions of this Agreement.

(*See id.*)

The parties dispute the meaning of these provisions and whether they prevented Defendants from negotiating with Waitr. According to UHT, as the Earn-Out Agreement gave it and its agents the right to negotiate with prospective tenants, having Scion send the proposed addendum to Waitr complied with the Earn-Out Agreement's terms. SCP disagrees and argues that once it presented Defendants with the letter of intent containing the compliant Waitr terms that the Earn-Out Agreement prevented Defendants from attempting to reach a different agreement with Waitr regarding those compliant terms.

The Court finds that the plain text of the Earn-Out Agreement does not unambiguously indicate which interpretation is correct. *See Nunnelley v. GE Capital Info. Tech. Solutions-North America*, 730 So. 2d 238, 241 (Ala. Civ. App. 1999) ("Whether a contract is ambiguous is a question of law for the trial judge."). Although SCP's right to negotiate and reach a preliminary agreement was nonexclusive, the Earn-Out Agreement does not specifically address UHT and its agents' obligations to honor any preliminary agreement reached between SCP and a prospective tenant. One possible interpretation of the Earn-Out Agreement is that, because SCP's right to negotiate was nonexclusive, UHT and its agents were free to continue negotiating with a prospective tenant even after SCP had reached a preliminary agreement with the tenant about certain lease terms. Another possible interpretation is that, because SCP had the right to reach a preliminary agreement with prospective tenants, Defendants could not alter the terms of any such agreement if those terms complied with the Earn-Out Agreement's requirements. This ambiguity presents a question of material fact as to whether Scion's negotiations with Waitr violated the Earn-Out Agreement. *See Whitetail Dev. Corp. v. Nickelson*, 689 So. 2d 865, 867 (Ala. Civ. App. 1996) ("When the terms of a contract are ambiguous in any way, however,

the determination of the true meaning of that contract is a question of fact for the finder of fact.").[4]

UHT also argues that SCP cannot succeed on its Waitr-related breach of contract claim because there is no evidence that Scion's proposed addendum is what caused Waitr to back out of the lease negotiations. The Court disagrees and concludes that there is sufficient evidence to find that Waitr backed out of the South 10 deal due to the proposed addendum. On March 7, 2017, Waitr's CEO emailed his real estate broker to inform him that Waitr no longer wanted to rent space at South 10. The reason given for Waitr's withdrawal was that "[w]e don't want to have to hire our own contractors etc." (*See* Doc. 74-4 at 3.)

The Scion addendum provided that UHT would "assist in arranging a general contractor to perform all Tenant improvements, under a contract between Tenant and the contractor. Landlord will reimburse Tenant for Landlord's contribution of $25,000 toward the improvements cost upon Tenant furnishing proof of payment and final lien waivers for all contractor work." (Doc. 74-3 at 7.) This differed from the terms of the original letter of

---

[4] Defendants attempt to make much of the fact that both parties understood that the Earn-Out Agreement permitted tenant-specific negotiations. This evidence, however, does not go toward whether the Earn-Out Agreement allowed Defendants to attempt to alter the terms of a preliminary agreement that had been reached between SCP and a prospective tenant.

intent which stated that: "Tenant has no experience in building out tenant improvements in a leased space. The tenant asks that the Landlord's (or SCP Tuscaloosa, LLC's) contractor perform the Tenant improvements." (*Id.* at 5.) After receiving notice of Waitr's March 7th email, Gatewood interpreted the statement "we don't want to have to hire our own contractors" to be a reference to Waitr's dissatisfaction with the addendum's proposal that Waitr enter into a contract with a general contractor to perform improvements on the retail space. (*See* Doc. 74-5 at 2.) The Court agrees with SCP that it is at least arguable that this proposal is what caused Waitr to send the March 7th email.

Moreover, SCP has presented evidence that could support a finding that Waitr's dissatisfaction with this proposal is what ultimately caused it to not rent space at South 10, but instead, move its business to Birmingham. To be sure, it is undisputed that Waitr continued negotiations with SCP after the March 7th email. On March 21, 2017, Waitr sent final architectural drawings of the proposed South 10 space to its real estate broker and asked him "[h]ow do we get this [deal] to completion?" (*See* Doc. 74-6 at 2.) Additionally, when the Earn-Out Agreement expired, on April 1, 2017, SCP included Waitr in the list of potential tenants with which it was actively negotiating. However, by May 2017, it was clear that Waitr would not be

leasing space at South 10. At that time, Waitr did not provide SCP with the reason for its withdrawal. Instead, the only rationale Waitr ever provided for its reluctance to rent space at South 10 was its prior statement that "[w]e don't want to have to hire our own contractors." (*See* Doc. 74-4 at 3.) Viewing the evidence in the light most favorable to SCP, the Court cannot say, as a matter of law, that something other than the proposed addendum must have caused Waitr to withdraw its interest in South 10. Accordingly, UHT's motion for summary judgment on the Waitr-related breach of contract claim is due to be denied.

**B.    Breach of Implied Contract**

SCP brings breach of implied contract claims against Scion regarding the BOBA and Waitr transactions. Under Alabama law, a party cannot recover under a theory of implied contract when an express contract governs the same subject matter. *See Vardaman v. Florence City Bd. of Educ.*, 544 So. 2d 962, 965 (Ala. 1989). Here, SCP does not dispute that its breach of implied contract claims against Scion are based on the failure to execute retail leases during the Earn-Out Period, which is governed by the Earn-Out Agreement. Instead, SCP states that "[w]hen UHT assigned the management duties to Scion . . . Scion became bound by [the Earn-Out Agreement]." (*See* Doc. 75 at 32.) This argument, however, is contrary to

Alabama law. SCP cannot succeed on a breach of implied contract claim where an express contract governs the transaction at issue. Although Scion was not a party to the Earn-Out Agreement, its only connection with SCP was through the Earn-Out Agreement between SCP and UHT, and it is alleged violations of the terms of this agreement that SCP seeks to hold Scion liable for. As it is undisputed that an express contract governed how leases were to be executed during the Earn-Out Period, SCP is precluded from bringing a breach of implied contract claim based on Scion's failure to execute those leases.

Even if this were not the case, SCP's breach of implied contract claims against Scion would still fail as a matter of law. As Defendants argue, "agents cannot be held liable for a principal's breach of contract." *Harrell v. Reynolds Metals Co.*, 495 So. 2d 1381, 1389 (Ala. 1986). It is undisputed that Scion's only role in executing the retail leases was to act as UHT's property management agent. Pursuant to the Property Management Agreement, Scion was to take actions on behalf of UHT, which is what it did when it reviewed both the BOBA and Waitr leases. Scion was not a party to the Earn-Out Agreement, and thus, unlike UHT, it was not bound by the Earn-Out Agreement's terms. Therefore, Scion is entitled to summary judgment on SCP's implied breach of contract claims. *See Money Mgmt. Servs., Inc. v.*

*Porraro*, 160 Fed. App'x 846, 847 (11th Cir. 2005) (applying Alabama law and affirming summary judgment on breach of contract claim where defendant's only role in contract was to act as another party's agent).

### C. Negligence

"To establish negligence, [a] plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994) (citing *Albert v. Hsu*, 602 So. 2d 895, 897 (Ala. 1992)). Although "[i]t is possible for a tort to arise in Alabama out of a breach of a duty implied by or arising out of a contract, . . . an ordinary breach of contract will not give rise to a tort." *Brown-Marx Assocs., Ltd. v. Emigrant Sav. Bank*, 703 F.2d 1361, 1371 (11th Cir. 1983). Indeed, "a negligent failure to perform a contract . . . is but a breach of the contract." *Vines v. Crescent Transit Co.*, 85 So. 2d 436, 440 (Ala. 1956). Thus, Defendants cannot be held liable under a negligence theory of liability for merely failing to adhere to the Earn-Out Agreement's requirements.

However, a breach of the implied duty to use reasonable skill and diligence in performing a contractual duty can constitute negligence. *See Sherrill v. Ala. Appliance Co.*, 197 So. 1, 4 (Ala. 1940). Here, there is sufficient evidence to find that UHT breached this duty. As SCP points out,

Defendants delayed in executing the BOBA lease even though it was compliant with the Earn-Out Agreement's requirements. Defendants also attempted to change the terms of the compliant Waitr letter of intent. Viewing the evidence in the light most favorable to SCP, it is at least arguable that UHT's actions violated the implied duty to use reasonable skill and diligence in performing a contractual duty. Moreover, although Scion was not a party to the Earn-Out Agreement, its failure to timely approve the compliant lease and letter of intent could be said to violate the duty to use due care in the performance of a voluntary undertaking. *See Beasley v. MacDonald Engineering Co.*, 249 So. 2d 844, 846 (Ala. 1971) ("[W]hen a person undertakes an employment, which requires care and skill, whether for reward or not, a failure to exert the measure of care and skill appropriate to the measure of such employment is negligence for which an action will lie." (internal quotations omitted).) As the Court finds that a question of fact exists as to whether Defendants' actions proximately caused SCP to lose out on the compensation contemplated by the Earn-Out Agreement, Defendants' motion for summary judgment on SCP's negligence claim is due to be denied.

### D. Unjust Enrichment

SCP's unjust enrichment claim is brought solely against UHT. "To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." *Matador Holdings, Inc. v. HoPo Realty Invs., LLC*, 77 So. 3d 139, 145 (Ala. 2011) (quoting *Portofino Seaport Vill., LLC v. Welch*, 4 So. 3d 1095, 1098 (Ala. 2008)). Here, SCP bases its unjust enrichment claim on its assertion that the only reason it spent the $430,000 in build-out expenses was that it expected to recoup those costs by receiving Earn-Out Payments after it procured tenants for South 10. According to Defendants, this expectation was unreasonable.

The Court cannot say, as a matter of law, that SCP's expectation of recouping the build-out costs was unreasonable. Although it is undisputed that SCP incurred $400,000 of the $430,000 in costs prior to forwarding the BOBA letter of intent to UHT, SCP knew of BOBA's interest in South 10 several months before the build-out began. Moreover, even though at the time SCP contracted for the build-out it had been unable to find a potential tenant, there is evidence that SCP thought the build-out would make South 10 an attractive location for retail tenants. Based on this evidence, a trier of

fact could find that it was reasonable for SCP to expect that after the build-out occurred it would be able to attract tenants and recoup the costs of the build-out through the Earn-Out Payments.

Nonetheless, SCP's unjust enrichment claim fails as a matter of law. "The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another." *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1193 (Ala. 2008) (cleaned up). As with claims for breach of an implied contract, the doctrine of unjust enrichment does not generally apply where there is an express contract between the parties governing the same subject matter. *See Mantiply v. Mantiply*, 951 So. 2d 638, 656 (Ala. 2006) ("[W]hen an express contract exists, an argument based on a quantum meruit recovery in regard to an implied contract fails." (quoting *Brannan & Guy, P.C. v. City of Montgomery*, 828 So. 2d 914, 921 (Ala. 2002))).

Here, it is undisputed that the Earn-Out Agreement governed SCP's relationship with UHT. Indeed, SCP bases its unjust enrichment claim on the fact that it spent the $430,000 in build-out costs "rel[ying] on UHT to follow the requirements of the [Earn-Out Agreement] and deal with [SCP] in good faith as that contract called for." (*See* Doc. 75 at 29.) Thus, while SCP

contends that UHT did not comply with the Earn-Out Agreement's requirements, it admits that the Earn-Out Agreement's terms governed its ability to recoup the build-out costs. If successful on its breach of contract claims, SCP will certainly claim this expense as part of its damages. Moreover, neither party questions whether the Earn-Out Agreement constituted a valid contract. Instead, their dispute centers on whether UHT failed to adhere to the Earn-Out Agreement's provisions. Accordingly, there is no need for the equitable doctrine of unjust enrichment to fill any gap created by the lack of an enforceable contract, and UHT is entitled to summary judgment on SCP's unjust enrichment claim.

### E.     Fraudulent Suppression

Finally, SCP brings a fraudulent suppression claim against UHT. To succeed on a fraudulent suppression claim, a plaintiff must demonstrate: "(1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury." *Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C.*, 932 So. 2d 883, 891 (Ala. 2005) (quoting *Lambert v. Mail Handlers Benefit Plan*, 682 So. 2d 61, 63 (Ala. 1996)). SCP's fraudulent suppression claim relates to whether UHT had a duty to qualify Lohmann's statement "the form lease you sent is fine" with

other, relevant information. There are two categories of facts that SCP alleges UHT failed to disclose. First, SCP asserts that UHT never informed it of the management agreement with Scion or of Scion's role in approving leases.[5] SCP also states that UHT failed to disclose that the BOBA lease form submitted for approval was deficient and would not be approved in its current form or that approved guarantors were required.

UHT argues that it is entitled to summary judgment on SCP's fraudulent suppression claim for two reasons: (1) it did not conceal any material fact from SCP; and (2) even if it did, SCP cannot demonstrate that it detrimentally relied on the suppression of these facts. The Court agrees that UHT did not conceal from SCP that the BOBA and Waitr leases would be reviewed by Scion. It is undisputed that sometime before April 27, 2016 Lohmann, acting on behalf of UHT, told Welch that Scion would need to look over the BOBA documents. Welch acknowledged that the BOBA lease would not be executed prior to Scion's review when he stated that he was "concerned about the timeline of the review by Scion" because Lohmann "indicated they haven't been incredibly swift to respond to some things." (*See*

---

[5]    Specifically, SCP alleges that UHT failed to inform it that: (1) there was an agreement for Scion to manage South 10; (2) that Scion was assigned the obligations and duties under the Earn-Out Agreement and became a successor to UHT; (3) that UHT and Scion would require their approval of any tenant and lease, notwithstanding UHT's previous approval; and (4) that executing the lease would require Scion's stockholder approval. (*See* Doc. 75 at 28–29.)

Doc. 70-5 at 2.) This conversation took place approximately a week before Lohmann told Welch that "the lease form you sent is fine." (*See* Doc. 70-6 at 2.) Thus, prior to receiving any indication that UHT had approved the BOBA documents, SCP was made aware that the lease would also need to be sent to Scion for its review.

There is evidence, however, that SCP was never made aware that Scion had entered into a management agreement with UHT, but instead, was left under the impression that Scion had purchased, or was in the process of purchasing, UHT. Indeed, it is unclear as to why, months before Scion entered into the management agreement with UHT, SCP was told that Scion would need to review the BOBA documents. Nonetheless, SCP has not shown how UHT's failure to disclose this information induced it to act differently than it otherwise would have. SCP contracted with Genoa Construction for the build-out work before it submitted the BOBA lease to UHT for approval. Additionally, SCP has not shown how its initial negotiations with BOBA, which took place between February and April 2016, would have been conducted differently if it knew about the impending management agreement between UHT and Scion.

Moreover, when SCP was negotiating with BOBA in May and June of 2016, it had already been made aware that Scion would need to review the

BOBA documents. SCP has not presented evidence of how it would have acted differently if it knew that this review would be conducted by the manager of UHT rather than UHT's new owner. Thus, SCP cannot use these undisclosed facts to support its suppression claim.[6]

The second category of facts that SCP asserts were suppressed relate to its contention that Lohmann approved the BOBA lease in May 2016 but did not inform SCP that the lease would not be executed unless it met additional requirements. This Court previously found that Lohmann's statement that "the lease form you sent is fine" plausibly created a duty for UHT to qualify that statement with information that the BOBA lease would not be approved unless additional requirements were met. (*See* Doc. 23 at 22.) The Court's reasoning was based on the allegations in SCP's original complaint that the terms of the June 13th BOBA lease forwarded to Scion had been previously approved by Lohmann in May 2016. (*See id.*)

Discovery has revealed, however, that after Lohmann's email SCP and BOBA made changes to the BOBA lease and that these changes were first presented to Defendants in June 2016. Two of these alterations, a request

---

[6]     As there is no evidence that Scion became a successor to UHT under the Earn-Out Agreement, SCP cannot use this allegation to support its suppression claim. Moreover, it is undisputed that one of the contingencies listed in the BOBA letter of intent was UHT's approval of the BOBA's guarantors' financial statement. Thus, SCP can hardly say that UHT suppressed the fact that the BOBA guarantors would be required to submit proof of financial stability before a lease would be executed.

to cap the growth of pass through expenses and a protected use provision, were among the BOBA lease terms that Defendants sought to revise. Because these provisions were not included in the May lease form, SCP cannot base its fraudulent suppression claim on its assertion that UHT failed to disclose that it would seek to alter these terms. Neither Lohmann nor anyone else at UHT had any way of knowing that SCP would seek to add these terms until they were included in the June 2016 lease. Once Defendants reviewed the June 2016 BOBA lease, they informed SCP that these provisions were unacceptable. Thus, there was no concealment.

But there is sufficient evidence to support a finding that UHT fraudulently suppressed that the form lease's management fee, which Scion sought to revise, was subject to alteration. Even when there is no independent duty to disclose, "once a party elects to speak, he or she assumes a duty not to suppress or conceal those facts that materially qualify the facts already stated." *CNH Am., LLC v. Ligon Capital, LLC*, 160 So. 3d 1195, 1202 (Ala. 2013) (quoting *Freightliner*, 932 So. 2d at 895). In May 2016, Lohmann, on behalf of UHT, told Welch that "the form lease was fine." This statement expressed UHT's approval of the lease terms included within the standard form lease. However, after it reviewed the June 2016 BOBA lease, Scion sought to increase the management (or administrative) fee

included in the standard form lease from 3% to 15%. Even though UHT informed SCP in April 2016 that Scion would also be reviewing these documents, there is no evidence that UHT ever informed SCP that Scion may seek to change the standard form lease's terms or fail to approve them. Lohmann arguably had a duty to do so when he indicated that the standard form lease's terms were acceptable.

There is also evidence that SCP relied on Lohmann's statement by keeping the management fee at 3% when it continued its negotiations with BOBA in May and June of 2016. Welch responded to Scion's revisions by stating that "[i]ncreasing the management fee five-fold to an out of market 15% rate . . . seem[s] averse to getting to a lease." (*See* Doc. 72-4.) BOBA replied to Scion's increased management fee by stating "[a]s the first tenant going to move in the University House, we would like to change the percentage of administrative fees charged to be 5%." (*See* Doc. 73-2 at 3.) On August 9, 2016, due to BOBA's concerns, Defendants agreed to limit the management fee to 5%. Accordingly, there is evidence that having a low management fee was important to these negotiations and that disagreements over Defendants' increase in this fee at least somewhat lengthened the amount of time it took to negotiate the BOBA lease.

However, there is no evidence to support SCP's contention that it relied on any concealment by UHT when it negotiated lease terms with Waitr. SCP first began negotiating with Waitr in December 2016. This was after BOBA had withdrawn its interest in the South 10 lease and Scion had executed the BOBA lease. Thus, at the time it began the Waitr negotiations, SCP was well aware of Scion's role in executing leases and that Scion had previously made changes to a lease sent for its approval. Accordingly, SCP cannot use evidence related to Waitr to support its fraudulent suppression claim.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (doc. 67) is due to be GRANTED in PART and DENIED in PART. An order consistent with this opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on April 15, 2019.

_____
L. Scott Coogler
United States District Judge

194800